# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Mark Falk |
| | : | |
| v. | : | Mag. No. 12-3615 |
| | : | |
| HOPE KANTETE, | : | |
| MANUEL DE JESUS OLIVARES, | : | **CRIMINAL COMPLAINT** |
| CHRISTOPHER BARNES, | : | |
| ROMAN VLADIMIR DILONE, | : | |
| MARK ANTHONY SPIVEY, | : | |
| KEVIN MILES, | : | |
| JOHN TURNER, | : | |
| EROMOSELE OKOEGUALE, | : | |
| KUNLE AJISAFE, | : | |
| MICHAEL BANKOLE OMOWAIYE, AND | : | |
| CARLOS L. ARNAU | : | |

I, Sean C. Larmon, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

## SEE ATTACHMENT A

I further state that I am a Special Agent with Immigration and Customs Enforcement, Homeland Security Investigations, and that this complaint is based on the following facts:

## SEE ATTACHMENT B

continued on the attached page and made a part hereof.

Sean C. Larmon, Special Agent
ICE/HSI

Sworn to before me, and
subscribed in my presence

May 18, 2012 at
Newark, New Jersey

HONORABLE MARK FALK
UNITED STATES MAGISTRATE JUDGE

Signature of Judicial Officer

**ATTACHMENT A**

**COUNT 1**
**(Conspiracy to Transport Stolen Vehicles)**

From at least in or around June 2010 through at least in or around December 2011, in Essex and Hudson Counties, in the District of New Jersey and elsewhere, the defendants,

HOPE KANTETE,
MANUEL DE JESUS OLIVARES,
CHRISTOPHER BARNES,
ROMAN VLADIMIR DILONE,
MARK ANTHONY SPIVEY,
KEVIN MILES,
JOHN TURNER,
EROMOSELE OKOEGUALE,
KUNLE AJISAFE,
MICHAEL BANKOLE OMOWAIYE, AND
CARLOS L. ARNAU,

did conspire to transport in interstate and foreign commerce motor vehicles, knowing the same to have been stolen, contrary to Title 18, United States Code, Section 2312.

In violation of Title 18, United States Code, Section 371.  Photographs of some of the stolen vehicles are annexed hereto as Attachment A.1.

## COUNT 2
### (Transportation of Stolen Vehicles)

From at least in or around August 2011 through at least in or around October 2011, in Essex County, in the District of New Jersey and elsewhere, the defendants,

HOPE KANTETE,
MARK ANTHONY SPIVEY, AND
EROMOSELE OKOEGUALE,

did transport in interstate and foreign commerce a 2009 Mercedes Benz, model GL550, a 2008 Mercedes Benz, model S550, and a 2008 Mercedes Benz, model ML 350, knowing the same to have been stolen.

In violation of Title 18, United States Code, Section 2312 and Section 2.

## COUNT 3
### (Transportation of Stolen Vehicles)

From at least in or around September 2011 through at least in or around December 2011, in Essex County, in the District of New Jersey and elsewhere, the defendants,

HOPE KANTETE,
MANUEL DE JESUS OLIVARES, AND
ROMAN VLADIMIR DILONE,

did transport in interstate and foreign commerce a 2010 Honda CR-V, knowing the same to have been stolen.

In violation of Title 18, United States Code, Section 2312 and Section 2.

## COUNT 4
### (Transportation of Stolen Vehicles)

From at least in or around September 2011 through at least in or around December 2011, in Essex County, in the District of New Jersey and elsewhere, the defendants,

HOPE KANTETE,
MANUEL DE JESUS OLIVARES,
CHRISTOPHER BARNES, AND
MARK ANTHONY SPIVEY,

did transport in interstate and foreign commerce a 2011 Acura TSX, knowing the same to have been stolen.

In violation of Title 18, United States Code, Section 2312 and Section 2.

## COUNT 5
### (Transportation of Stolen Vehicles)


On or around October 20, 2012, in Essex County, in the District of New Jersey and elsewhere, the defendant,

### KUNLE AJISAFE,

did transport in interstate and foreign commerce a 2010 Honda Accord and  a 2010 Land Rover Range Rover, knowing the same to have been stolen.

In violation of Title 18, United States Code, Section 2312 and Section 2.

### ATTACHMENT B

I, Sean C. Larmon, am a Special Agent with Immigration and Customs Enforcement, Homeland Security Investigations ("HSI"), assigned to the Newark Division. I am fully familiar with the facts set forth herein based on my own investigation, my conversations with other law enforcement officers, and my review of reports, documents, and items of evidence.  Where statements of others are related herein, they are related in substance and part. Where I assert that an event took place on a particular date, I am asserting that it took place on or about the date alleged.  Because this complaint is being submitted for a limited purpose, I have not set forth each and every fact that I know concerning this investigation.

### OBJECT AND OVERVIEW OF THE CONSPIRACY TO TRAFFIC STOLEN VEHICLES

1.      The investigation has revealed that numerous stolen vehicles have been illegally exported, or attempted to be exported, from the seaports in Newark and Elizabeth, New Jersey, to various destinations overseas, including to Nigeria, Ghana, Guinea, Sierra Leone and Gambia, among other countries. These vehicles were either stolen or carjacked in various states, including in New Jersey.  The overseas market for stolen and carjacked vehicles is growing because customers can purchase those vehicles at a cost significantly lower than the fair market value of the vehicles.

2.      To fill this growing demand, the Defendants (identified below) have joined a criminal organization that involves the theft, carjacking, sale, receipt, transportation, interstate trafficking and illegal exportation of stolen and altered motor vehicles and motor vehicle parts.  This organization is wide and extensive and generally operates in multiple layers, as follows:

a.      One layer of the auto-theft exportation organization includes the individuals who steal motor vehicles.  In some instances, the motor vehicles are carjacked.  The theft and carjacking of vehicles is usually done by individuals who are gang members or who are otherwise affiliated with a gang.

b.      A second layer of the auto-theft exportation organization involves individuals who sell and purchase stolen or carjacked vehicles.  Those vehicles are typically sold to a fence, *i.e.*, someone who purchases the stolen vehicles for just a few thousand dollars, even if the vehicle is a brand new luxury vehicle worth tens of thousands of dollars.  A fence typically employs "runners," *i.e.*, individuals who drive the stolen and carjacked vehicles from one location to another to avoid detection of the vehicles and who collect payments from sales of the vehicles.

c.      A third layer of the auto-theft exportation organization involves individuals who "retag" the vehicles after they are stolen or carjacked.  The process of "retagging" involves altering the Vehicle Identification Number ("VIN"), that is, the unique serial number used by the automotive industry to identify individual motor vehicles.  In some instances, the "new" VIN is fictitious.  In other instances, the VIN is a duplicate of an existing VIN that was not designed or manufactured for the stolen or carjacked vehicle.  Part of the re-tagging typically takes place in parking lots, in garages and even on the streets.  In addition to altering the VIN on stolen or carjacked vehicles, the members of the organization obtain a counterfeit Certificate of Title for stolen vehicles to match the new or fictitious VIN.  A Certificate of Title is a document for a motor vehicle issued by a state, describing the vehicle by year, make, model, color and VIN, as well as listing the name and address of the owner and/or lienholder (financial institution that loaned money to buy the car).

      d.      After a stolen or carjacked vehicle has been retagged, the fourth layer of the criminal activity involves the sale of the vehicle to a customer. The "customers" in this case are either individuals who purchase the vehicles for their personal use in the United States or overseas, or individuals who ship stolen and carjacked vehicles from the United States to other countries to resell them to end-users. In some instances, the customers place orders, that is, they tell fences that they are looking to buy specific vehicles. In other instances, individuals who steal or carjack vehicles contact the fences and let them know the type of vehicles available for sale.

      e.      A fifth layer of criminal activity involves individuals who coordinate the exportation of stolen vehicles overseas. Vehicles are shipped abroad through a Non-Vessel Operating Common Carrier ("NVOCC"). An NVOCC is a company licensed by the Federal Maritime Commission ("FMC") that is bonded and insured for purposes of exporting goods in foreign commerce. Individual persons or entities who are not licensed with the FMC obtain the services of NVOCCs to ship goods overseas. The NVOCC leases containers and guarantees space on vessels being operated by major shipping carriers who will only do business with entities who are bonded and insured. The NVOCC do not take physical custody of the goods or containers. Instead, they process documents required by Customs and the shipping carriers who actually ship the goods in foreign commerce, such as a Shipper's Export Declaration, bill of lading and dock receipts. Because NVOCCs require documentation from persons shipping vehicles, customers typically use a middle person to conduct the transaction in an attempt to insulate themselves. Alternatively, customers present fraudulent documentation to conceal the true information about the vehicles being exported overseas, such as altered Certificates of Title.

9

## OVERVIEW OF THE DEFENDANTS

3.    **HOPE KANTETE,** a/k/a "the Lady," is a large-scale fence, that is, someone with an extensive customer base who buys stolen/carjacked vehicles not only from street gang members and other individuals but also from other fences like MANUEL DE JESUS OLIVARES.  HOPE KANTETE resells those vehicles at a higher price, and she facilitates the exportation of stolen/carjacked vehicles overseas for her customers.

4.    **MANUEL DE JESUS OLIVARES,** like HOPE KANTETE, is a fence. In addition, MANUEL DE JESUS OLIVARES retags stolen vehicles, that is, alters the vehicle identification number of stolen vehicles to make them appear legitimate for purposes of selling them domestically and facilitating the export of those vehicles from the United States to various destinations overseas.

5.    **CHRISTOPHER BARNES,** a/k/a "CB," is an associate of HOPE KANTETE and MANUEL DE JESUS OLIVARES.  He is also a "runner," *i.e.*, an individual who drives stolen and carjacked vehicles from one location to another to avoid detection of the vehicles.  CHRISTOPHER BARNES also sells stolen and carjacked vehicles.

6.    **ROMAN VLADIMIR DILONE,** a/k/a "Aldeni," a/k/a "Vlady," is a "title guy," *i.e.*, someone who, among other things, alters the VIN of legitimate Certificates of Title to match the altered VIN on a stolen vehicle.

7.    **MARK ANTHONY SPIVEY,** a/k/a "Ant," is a "runner," *i.e.*, someone who transports stolen vehicles on behalf of a fence.  MARK ANTHONY SPIVEY transports vehicles for both MANUEL DE JESUS OLIVARES and HOPE KANTETE.  MARK ANTHONY SPIVEY also collects payments on behalf of HOPE KANTETE.

8.     **KEVIN MILES**, a/k/a "Kev," sells stolen vehicles to fences like MANUEL DE JESUS OLIVARES, who then would mark up the price and resell the vehicles to other fences like HOPE KANTETE, who maintains an extensive customer base for the export of the vehicles.

9.     **JOHN TURNER**, a/k/a "Ricky," is an associate of HOPE KANTETE and a "runner," *i.e.*, an individual who drives stolen vehicles from one location to another to avoid detection of the vehicles.  JOHN TURNER is also a middleman between the street gang members and a "fence."

10.     **EROMOSELE OKOEGUALE**, a/k/a "Ero," is an associate of HOPE KANTETE.  He purchases stolen vehicles from HOPE KANTETE in order to facilitate the export of stolen vehicles overseas.  He also receives money from overseas clients through wire transactions and then funnels money back to HOPE KANTETE.

11.     **KUNLE AJISAFE,** a/k/a "Big Boy," is an associate of HOPE KANTETE.  He purchases stolen vehicles from HOPE KANTETE in order to facilitate the export of the vehicles overseas and submits altered Certificates of Title to facilitate the export.

12.     **MICHAEL BANKOLE OMOWAIYE**, a/k/a "Bankie," is an associate of HOPE KANTETE and KUNLE AJISAFE.  He brokers transactions involving stolen vehicles.

13.     **CARLOS ARNAU**, a/k/a "Carlito," sells stolen vehicles to fences like MANUEL DE JESUS OLIVARES.  He is also a "runner," *i.e.*, an individual who drives stolen vehicles from one location to another to avoid detection of the vehicles.

## THE CONSPIRACY CONDUCT

**Confidential Source**

      14.    Confidential Source Number 1 ("CS1") is an individual who was engaged in the illegal export of stolen vehicles.  CS1 disclosed to law enforcement that he/she has known HOPE KANTETE since approximately 2004.  He/she knows that HOPE KANTETE is in the business of buying and selling stolen/carjacked vehicles, arranging for those vehicles to be retagged, and shipping them overseas.  He/she has personally assisted HOPE KANTETE ship stolen vehicles overseas.  Two of those shipments are discussed below.

      15.    CS1 also disclosed to law enforcement that he has known MANUEL DE JESUS OLIVARES since approximately 2009.  He/she knows that MANUEL DE JESUS OLIVARES is in the business of buying and selling stolen vehicles and participating in the retagging of stolen vehicles so that those vehicles could be shipped overseas or sold domestically.   He/she has personally engaged in transactions with  MANUEL DE JESUS OLIVARES to retag stolen vehicles.

      16.    CS1 has also engaged in transactions with certain defendants, as summarized below.

**September 2011 Shipment of Stolen Vehicles to Nigeria**

      17.    On or about August 25, 2011,  CS1 met with defendant HOPE KANTETE in Hudson County, New Jersey.  CS1 agreed to have that meeting monitored and recorded. During that recorded meeting, HOPE KANTETE expressed her desire to have certain stolen vehicles stored in a warehouse in New Jersey, which was being operated by CS1 and was equipped with video surveillance (the "Warehouse").  The same day, at approximately 8:58 p.m., CS1 called HOPE KANTETE over a cellular telephone that was being consensually monitored

and recorded by Homeland Security Investigations.  The recordings reflect that HOPE KANTETE said, "five minutes" (meaning that a car would be arriving in five minutes).  At approximately, 9:01 p.m., HOPE KANTETE called CS1 and told him/her, "one is on the deck." CS1 understood, based on his/her prior dealings with HOPE KANTETE, that a stolen vehicle was arriving at the Warehouse.  At approximately 9:08 p.m., an individual later identified as defendant MARK ANTHONY SPIVEY, a/k/a "Ant," arrived at the Warehouse with a silver 2009 Mercedes-Benz, model GL550 (the "GL550").  CS1 opened the door to the Warehouse. Law enforcement observed MARK ANTHONY SPIVEY driving the GL550 into the Warehouse.

18.     MARK ANTHONY SPIVEY left the Warehouse but returned shortly thereafter with a black 2008 Mercedes-Benz S550 (the "S550").  After dropping off the GL550 and the S550 at the Warehouse, law enforcement agents who were conducting surveillance observed MARK ANTHONY SPIVEY and an unidentified male enter a vehicle which had been parked near the Warehouse.  Earlier that day, law enforcement had observed HOPE KANTETE driving that same vehicle.  Minutes after the GL550 and the S550 were delivered to the Warehouse, HOPE KANTETE called CS1 and thanked him/her for accepting the vehicles.

19.     On August 26, 2011, HOPE KANTETE called CS1 on the telephone and advised him that another vehicle would arrive at the Warehouse.  Later that day, law enforcement agents conducting surveillance observed MARK ANTHONY SPIVEY deliver a gold 2008 Mercedes-Benz, model ML350 ("ML350") to the Warehouse.  MARK ANTHONY SPIVEY was observed removing a license plate from the ML350 and leaving the Warehouse. The investigation revealed that the license plate that MARK ANTHONY SPIVEY removed from the ML350 was actually registered to a 2001 Ford Focus which was owned and operated by him.

20.     The investigation revealed that all three vehicles were stolen just a few weeks before they were delivered to the Warehouse: the GL550 was stolen in Cresskill, New Jersey on or about August 18, 2011; the S550 was stolen in Hackensack, New Jersey on or about August 9, 2011; and the ML350 was stolen in North Arlington, New Jersey on or about August 4, 2011.

21.     As part of the conspiracy, CS1 made arrangements to have the stolen vehicles described in paragraph 20, above, shipped to Tin Can Island, a port in the city of Lagos, Nigeria. This arrangement was made after CS1 met with HOPE KANTETE on August 31, 2011, at which time HOPE KANTETE gave CS1 a "paper" (carfax report with the VIN of a 2008 Mercedes-Benz S550 and the name of the overseas consignee listed on the back). On September 1, 2011, CS1 called HOPE KANTETE and asked, "This thing you gave me last night, right? That "paper" you gave me last night....there is another name there." Because the "paper" had two names written on it, CS1 was asking HOPE KANTETE which name he/she should put as the consignee of the container with the stolen vehicles (one shipping container holds three vehicles). HOPE KANTETE replied, "No, use the first and last." CS1 then asked HOPE KANTETE, "Uh, Bridget, uh?" HOPE KANTETE replied, "No, don't worry about that…just worry about the other, the top one." The "top" name was "JOE EKONG." The three stolen vehicles were shipped on or about September 12, 2011 through an international shipping company to JOE EKONG in Tin Can Island, Lagos, Nigeria.  The total cost of shipment was $6,000.

22.     On or around September 28, 2011 -- just 16 days after the vehicles had been shipped to Nigeria -- MARK ANTHONY SPIVEY gave CS1 $6,000 on behalf of HOPE KANTETE in Hudson County, New Jersey.  CS1 understood that the $6,000 was to cover the

shipping expenses.  On or around September 28, 2011, CS1 turned over the $6,000 to law enforcement.

       23.    On or about October 31, 2011, the three stolen vehicles arrived in Tin Can Island Port in Lagos, Nigeria.  The container with the vehicles was originally scheduled to arrive on or about October 14, 2011, but was delayed by the shipping line.  Additionally, CS1 had not yet provided HOPE KANTETE with the original bill of lading, which is used as proof of payment to the shipping line in order to release the vehicles in Nigeria.

       24.    As a result of the delayed shipment and no proof of payment to the shipping line, EROMOSELE OKOEGUALE spoke with HOPE KANTETE on a telephone about the delay.  Intercepted communications revealed that the container EROMOSELE OKOEGUALE and HOPE KANTETE discussed over the telephone was scheduled to arrive on or about the same time period during which the container with the stolen vehicles was scheduled to arrive; and it was scheduled to arrive in Tin Can Island Port -- the same destination as the container that HOPE KANTATE had shipped with the three stolen vehicles.  Additionally, KANTETE told EROMOSELE OKOEGUALE, "I am sure he didn't pay the damn thing.  And I pay him double!  I asked him, 'How much is the company going to sell you?  He tells me and I give me six,'" meaning $6,000 to ship the vehicles overseas.

       25.    The fair market value of the three vehicles referenced in paragraph 20 is approximately $149,000.  The investigation revealed that approximately three months prior to the time that the three stolen vehicles were shipped to Nigeria, the consignee of the container with the three stolen vehicles (JOE EKONG) wired approximately $28,000 to EROMOSELE OKOEGUALE in three transactions.  The wire transfers to EROMOSELE OKOEGUALE were as follows: $10,000 on June 24, 2011; $10,000 on June 27, 2011, and $8,000 on June 28, 2011.

The investigation also revealed that shortly after the stolen vehicles were shipped to JOE

EKONG on September 12, 2011, EROMOSELE OKOEGUALE received another $27,925 in

three wire transactions from Nigeria. The wire transfers to EROMOSELE OKOEGUALE were

as follows: $9,975 on September 14, 2011; $9,975 on September 19, 2011; and $7,975 on

September 20, 2011. On September 28, 2011, EROMOSELE OKOEGUALE paid HOPE

KANTETE $4,500.

**October 2011 Shipment of Stolen Vehicles to Nigeria**

26.     As part of the conspiracy, the Defendants also transported in interstate and

foreign commerce three stolen vehicles: (1) a 2010 Honda CR-V; (2) a 2011 Acura TSX; and (3)

a 2011 Honda Pilot. The allegations concerning each of these stolen vehicles are set forth below.

27.     **Honda CR-V**: On September 13, 2011, at approximately 6:35 p.m.,

MANUEL DE JESUS OLIVARES called HOPE KANTETE on a telephone. MANUEL DE

JESUS OLIVARES asked, "Do you know who's looking for a CR-V, 2010, leather" (MANUEL

DE JESUS OLIVARES appears to have been referring to a 2010 Honda CR-V). HOPE

KANTETE expressed an interest in the vehicle and asked MANUEL DE JESUS OLIVARES to

"[f]ind out if the price is perfect." He immediately called an unidentified male and inquired

about the price of the 2010 Honda CR-V. The unidentified male responded, "two papers"

(meaning $2,000). At 6:36 p.m., MANUEL DE JESUS OLIVARES called HOPE KANTETE

and stated, "full loaded 3000," marking up the price from $2,000 so that he could earn a profit of

$1,000. HOPE KANTETE asked, "3 Gs?" (meaning $3,000). She then added, "I think we

should get it." MANUEL DE JESUS OLIVARES asked, "You think if I buy it you flip it for

me?" HOPE KANTETE agreed.

28.     On September 17, 2011, at approximately 1:08 p.m., HOPE KANTETE and MANUEL DE JESUS OLIVARES spoke on a telephone. MANUEL DE JESUS OLIVARES told HOPE KANTETE, "the Honda Accord is ready, the two-door...send whomever you are going to send." HOPE KANTETE responded, "tell the guy to do the [U/I] so I can pick up everything right away." MANUEL DE JESUS OLIVARES responded, "Ok, the T?" KANTETE replied, "Uh-hum." MANUEL DE JESUS OLIVARES then stated, "Okay, I will tell Vlady [ROMAN VLADIMIR DILONE] to do the T and, and, because I want to get this over cause I have a CRV and a Honda Accord..." Based upon my training and experience, the "T" being referred to is a Certificate of Title for a motor vehicle.

29.     On September 20, 2011, at approximately 2:58 p.m., MANUEL DE JESUS OLIVARES called HOPE KANTETE and stated, "I gonna have that . . . CR-V done." HOPE KANTETE responded, "Ok . . . I'm gonna bring you a whole lot of f**king work. I got so much f**king work for you." That same day, at approximately 3:34 p.m., MANUEL DE JESUS OLIVARES spoke on the telephone with ROMAN VLADIMIR DILONE. After greeting each other, they had the following conversation, in substance and in part:

> DILONE: Talk to me man.
> OLIVARES: Do me this . . Honda CR-V
> DILONE: What was that?
> OLIVARES: CR-V . . .
> DILONE: Oh, the CR-V, okay.
> OLIVARES: Uh-huh, do me one. Send it to me today.
> DILONE: Uh-huh. What year? 2010?
> OLIVARES: 2010 . . . mm-hmm.
> DILONE: Ok.

MANUEL DE JESUS OLIVARES then proceeded to read the following VIN to ROMAN VLADIMIR DILONE. They agreed that ROMAN VLADIMIR DILONE would send "it" when it is ready (meaning that he would send the Certificate of Title after it is completed). At

approximately 4:34 p.m., ROMAN VLADIMIR DILONE and MANUEL DE JESUS

OLIVARES spoke again on the telephone and ROMAN VLADIMIR DILONE informed

MANUEL DE JESUS OLIVARES that he can come and get "it" (meaning the title).

       30.    At approximately 5:45 p.m., law enforcement observed ROMAN

VLADIMIR DILONE arrive at a garage in Jersey City, New Jersey that is used by MANUEL

DE JESUS OLIVARES.  At 5:52 p.m., ROMAN VLADIMIR DILONE exited the garage on

foot, entered his vehicle and departed.

       31.    At approximately 5:55 p.m., HOPE KANTETE and MANUEL DE JESUS

OLIVARES spoke on the telephone, at which point MANUEL DE JESUS OLIVARES informed

HOPE KANTETE, "Listen, I got your T for that blue thing in my hand." "And…that, that CRV

is ready."  HOPE KANTETE asked, "is it in a [U/I] where I can pick it up tomorrow?"

MANUEL DE JESUS OLIVARES responded, "Yeah Ok, pick it up tomorrow."  At

approximately 6:15 p.m., law enforcement observed a silver Honda CRV in the same garage in

Jersey City, New Jersey used by MANUEL DE JESUS OLIVARES.

       32.    On September 24, 2011, an unidentified male delivered a silver, 2010

Honda CR-V at the Warehouse.  The investigation revealed that that vehicle had the same VIN

that MANUEL DE JESUS OLIVARES read to ROMAN VLADIMIR DILONE over the

telephone.

       33.    The investigation also revealed that the 2010 Honda CR-V was stolen in

New York, New York on or about September 22, 2011.  Based on my training and experience, I

believe that HOPE KANTETE, MANUEL DE JESUS OLIVARES, ROMAN VLADIMIR

DILONE and others agreed to alter the VIN of a stolen 2010 Honda CR-V.  As alleged below,

this vehicle was subsequently shipped to Nigeria.

34.    **Stolen 2011 Acura TSX**: On September 20, 2011, at approximately 8:26 p.m., defendant CHRISTOPHER BARNES called MANUEL DE JESUS OLIVARES and told him, "I got a TSX, that wagon." MANUEL DE JESUS OLIVARES asked about the year. When CHRISTOPHER BARNES said it was 2011 and that "they only want 1500 for it," MANUEL DE JESUS OLIVARES  responded with excitement, "What?!"

35.    Minutes later, at approximately 8:30 p.m., MANUEL DE JESUS OLIVARES called an unidentified male. MANUEL DE JESUS OLIVARES told him, "listen, listen . . . they have that Acura TSX, the wagon, that new body style. . . They want for that one like $2,000 I think," marking up the price of the vehicle to make a $500 profit. The unidentified male responded, "I want it. I want it. I'm about to get it. Give me a . . . don't let them . . . listen just let me do what I got to do. And I'm a call your phone and answer your phone, alright?

36.    On September 23, 2011, HOPE KANTETE and MANUEL DE JESUS OLIVARES spoke on a telephone. The intercepted communications show that HOPE KANTETE had possession of an Acura TSX. HOPE KANTETE told MANUEL DE JESUS OLIVARES, "The stuff that I wanted you to do for me. You gonna get the info right?" MANUEL DE JESUS OLIVARES expressed that "it's better to do it with the same information" and then he asked her whether she "want[ed] to do it . . . without record or . . . with record on it?" Based upon my training and experience, "with record" refers to the cloning of a legitimate VIN, so that it could be used for a stolen vehicle that has the same or similar make, model, color and year as a vehicle with a legitimate VIN. This information could be obtained from public records, such as reports generated by Carfax.com which contains information about the history of a vehicle, including information about whether the vehicle was ever reported stolen or was ever involved in an accident, among other things.

37.     MANUEL DE JESUS OLIVARES then spoke with the unidentified male who had previously expressed an interest in purchasing the Acura TSX.  MANUEL DE JESUS OLIVARES informed him that "somebody is gonna try to buy that thing.  The thing you want, somebody is trying to buy it.  I'm just letting you know."

38.     On September 28, 2011, law enforcement agents observed MARK ANTHONY SPIVEY drop off a 2011 Acura TSX at the Warehouse.  Immediately thereafter, law enforcement observed him enter a vehicle which was also occupied by HOPE KANTETE and was parked near the Warehouse.

39.     Law enforcement confirmed that the 2011 Acura TSX was reported stolen on or about September 3, 2011, in Mountain Lakes, New Jersey.  As alleged below, this vehicle was subsequently shipped to Nigeria.

40.     **Stolen 2011 Honda Pilot:** On or around September 23, 2011, HOPE KANTETE spoke with CS1 and informed him/her that another vehicle would be arriving at the Warehouse.  On September 23, 2011, law enforcement observed MARK ANTHONY SPIVEY deliver a black 2011 Honda Pilot to the Warehouse.  Law enforcement confirmed that the 2011 Honda Pilot was stolen on September 7, 2011, in New York, New York.  As alleged below, this vehicle was subsequently shipped to Nigeria.

41.     **Shipment of Stolen Vehicles**: HOPE KANTETE made arrangements with CS1 to have the three stolen vehicles shipped overseas: the 2010 Honda CR-V, the 2011 Honda Pilot and the 2011 Acura TSX.  Specifically, CS1 met with HOPE KANTETE and received shipping instructions as well as an envelope with the name of the overseas consignee written on the outside.

42.     As part of the conspiracy, CS1 made arrangements to have the stolen vehicles shipped to Tin Can Island, Lagos, Nigeria.  CS1 made arrangements with an international shipping company to have all three stolen vehicles shipped in a container (one container holds three vehicles).  The three stolen vehicles were shipped on or about October 10, 2011.  The total cost of shipment was $6,000.

43.     On or about December 8, 2011, HOPE KANTETE met CS1 in Hudson County, New Jersey, and handed him/her $6,000 as payment for the shipment.    On or about December 9, 2011, CS1 turned over to law enforcement the $6,000 he/she had received from HOPE KANTETE. The container with the three stolen vehicles arrived in Nigeria on or about November 16, 2011.

**The Carjacked Jaguar**

44.     On or about June 10, 2011, law enforcement learned that silver 2009 Jaguar XF Supercharged was carjacked in Morristown, New Jersey.

45.     On or about June 15, 2011, CS1 met with MANUEL DE JESUS OLIVARES in Hudson County, New Jersey.  CS1 consented to have the meeting recorded and monitored.  At the meeting, CS1 understood, based on prior dealings with MANUEL DE JESUS OLIVARES, that MANUEL DE JESUS OLIVARES had retagged a carjacked Jaguar (*i.e.*, MANUEL DE JESUS OLIVARES had altered the vehicle's VIN).  Specifically, during the meeting, CS1 asked, "The Jag is gone?" [U/I] "The lady got it?"   CS1 was questioning whether HOPE KANTETE had taken possession of a silver 2009 Jaguar XF Supercharged that was previously parked near MANUEL DE JESUS OLIVARES' place of business in Jersey City, New Jersey.  MANUEL DE JESUS OLIVARES responded, "That car was a f\*\*king car-jacking."  MANUEL DE JESUS OLIVARES added, "I told [HOPE KANTETE] . . . the day

before yesterday . . . Listen, let me tell you something. This is the last time I'm gonna . . . when you get cars from "C.B.," don't call me."[1] CS1 asked, "Oh, she got it from CB?" MANUEL DE JESUS OLIVARES responded, "Yeah, as a matter of fact, she, she got that car because of me. It's true. It's true. I not gonna, you know, I not gonna say nothing. She been buying, you know." CS1 asked, "Buying from C.B.?" MANUEL DE JESUS OLIVARES responded, "yeah sometimes." MANUEL DE JESUS OLIVARES then told CS1:

> A friend came [U/I]. He bring me the, the, the, BMW, the 520
> [U/I] 2012. That shit is beautiful." He says, "Jesus, lemme ask
> you something. Do you have something to do about that car down
> there?" I say, "What car?" He say, "That, that Jag." I said, "yeah,
> you know, I didn't bought it but some . . . I know who the owner."
> He said, "Listen Jesus. That car has been in, in the area for so
> long. That car, it was a car-jacking." I said, "What?" OLIVARES
> continues, "I stayed right there but the day before yesterday I stood
> almost till eight o'clock outside watching . . . to see, really
> watching that car to do that car. I went around like three times,
> and pull it in, I did it [slaps hands] put it outside, say here we go.
> Get out it. Don't bring me no [carjacked] car."

46.     On or about June 30, 2011, law enforcement officials recovered a silver 2009 Jaguar XF Supercharged scheduled for export from the Bayonne Auto Terminal to Nigeria. Law enforcement confirmed that the VIN on the silver 2009 Jaguar XF Supercharged was fictitious. Law enforcement also confirmed that from in or around May 15, 2011 to in or about June 15, 2011, only one silver 2009 Jaguar XF Supercharged had been carjacked in the State of New Jersey. Additionally, law enforcement confirmed, through CS1, that they had recovered the same vehicle that had been retagged by MANUEL DE JESUS OLIVARES based upon unrecorded conversations between CS1 and MANUEL DE JESUS OLIVARES.

**Other Stolen Vehicles**

---

[1]        "CB" is an alias of defendant Christopher Barnes.

47.    **Altered VIN of 2008 Infinity FX35**: On September 9, 2011, at approximately 7:57 p.m., CHRISTOPHER BARNES called MANUEL DE JESUS OLIVARES. During that conversation CHRISTOPHER BARNES asked MANUEL DE JESUS OLIVARES whether he needed "the numbers" "for the FX35 08'." Specifically, CHRISTOPHER BARNES asked, "So I gotta get the VIN numbers for you, right?" MANUEL DE JESUS OLIVARES responded, "You gotta bring me the number." CHRISTOPHER BARNES then stated, "Alright, I will bring you number. I'm going to bring you numbers and you gonna fix it for them, like that; then you can do it. Alright. Okay." MANUEL DE JESUS OLIVARES responded, "That's cool like that."

48.    Based on my training and experience, I believe that MANUEL DE JESUS OLIVARES and CHRISTOPHER BARNES agreed to alter the VIN of a 2008 Infinity FX35 to make it appear that is was not stolen.

49.    **2011 Acura TL**: On October 16, 2011, at approximately 4:49 p.m., HOPE KANTETE spoke with JOHN TURNER, a/k/a "Ricky," on a telephone. JOHN TURNER told HOPE KANTETE, "Check this, TL 2011." HOPE KANTETE asked, "How much?" JOHN TURNER responded, "two." And HOPE KANTETE clarified, "Two Gs?" (meaning two thousand dollars). When JOHN TURNER confirmed that it was $2,000, HOPE KANTETE instructed him, "alright get it  . . . I'll pay tomorrow."

50.    Based on my training and experience, I believe that JOHN TURNER agreed to sell a stolen 2011 Acura TL to HOPE KANTETE.

51.    **2008 Porsche Cayenne**: On May 4, 2011, the owner of a 2008 Porsche Cayenne reported his/her vehicle stolen in Fort Lee, New Jersey. That same vehicle was subsequently recovered at the seaport in Newark, New Jersey, scheduled to be shipped to

23

Guinea. A forensic examination of that vehicle revealed that JOHN TURNER's fingerprint was found on that vehicle.

52.    **2011 Range Rover**: On October 18, 2011, at approximately 10:37 a.m., HOPE KANTETE and CHRISTOPHER BARNES spoke on a telephone. CHRISTOPHER BARNES stated, "He got the RR . . . the 2011." HOPE KANTETE asked, "What do they want?" CHRISTOPHER BARNES answered, "The most they'll go is 65" (meaning $6,500). HOPE KANTETE responded, "65 right now . . . I got the money in my bag . . . You know anything to do with RR you can never go wrong with me. That's my number one selling shit."

53.    **2011 BMW X5**: On September 13, 2011, at approximately 8:28 p.m., KEVIN MILES spoke with MANUEL DE JESUS OLIVARES on a telephone. KEVIN MILES told MANUEL DE JESUS OLIVARES that he had a 2011 BMW X5 for "five," meaning $5,000. MANUEL DE JESUS OLIVARES responded "alright." Based on my training and experience, and my knowledge that a 2011 BMW X5 has a market value substantially higher than $5,000, I believe that MANUEL DE JESUS OLIVARES agreed to purchase a stolen vehicle from KEVIN MILES.

54.    In addition, a confidential source ("CS2") revealed to law enforcement that he/she has sold stolen vehicles to KEVIN MILES who, in turn, would resell the vehicles to other fences and would also facilitate the export of the vehicles overseas.

55.    **2011 Honda Accord**: On September 15, 2011, at approximately 4:45 p.m., defendant CARLOS ARNAU spoke with MANUEL DE JESUS OLIVARES on a telephone. Intercepted communications revealed that CARLOS ARNAU asked MANUEL DE JESUS OLIVARES to broker the sale of a 2011 Honda Accord with a V6 engine and a navigation system for $2,000. At approximately 6:31 p.m., they spoke on the telephone again

and MANUEL DE JESUS OLIVARES stated, "I'm talking to some people to see if they want that thing, I will call you back." Based on my training and experience, I have probable cause to believe that MANUEL DE JESUS OLIVARES and CARLOS ARNAU attempted to sell a stolen motor vehicle.

**Sale of Stolen Vehicles to Customer:**

56.     On September 15, 2011, MANUEL DE JESUS OLIVARES spoke with ROMAN VLADIMIR DILONE on a telephone.  MANUEL DE JESUS OLIVARES stated, "Okay a Honda Accord, 2009, blue."  ROMAN VLADIMIR DILONE responded, "Wait let me get something to write."  MANUEL DE JESUS OLIVARES then proceeded to spell out the alphanumeric characters of a specific VIN.  MANUEL DE JESUS OLIVARES told ROMAN VLADIMIR DILONE, "Okay.  To pick up in the morning, you already know."

57.     On September 24, 2011, MANUEL DE JESUS OLIVARES spoke with ROMAN VLADIMIR DILONE on a telephone.  MANUEL DE JESUS OLIVARES stated, "I have another thing here.  Write it down so you can **make it** and send it to me."  (Emphasis added).  MANUEL DE JESUS OLIVARES then stated, "Okay, is a Range Rover 2010 . . . like a dark gray."  He then proceeded to spell out the alphanumeric characters of a specific VIN for ROMAN VLADIMIR DILONE.   ROMAN VLADIMIR DILONE repeated the VIN and agreed that he would "send it."

58.     The investigation revealed that the vehicles referenced by MANUEL DE JESUS OLIVARES and ROMAN VLADIMIR DILONE in paragraphs 57 and 58 were shipped by KUNLE AJISAFE on or about October 20, 2011 from Jacksonville, Florida to Lagos, Nigeria.  Law enforcement confirmed that the Certificates of Title submitted to U.S. Customs

and Border Protection ("CBP") to facilitate the export were altered to reflect the VIN of another

vehicle of the same make and model.

59.     In addition, the investigation revealed that on or about February 2, 2012,

KUNLE AJISAFE attempted to ship through Florida three other vehicles that were stolen in New

Jersey: (1) a 2011 Mercedes Benz, E350, (2) a 2011 Land Rover Range Rover and (3) a 2008

Mercedes Benz, C300.  Law enforcement confirmed that the Certificates of Title submitted to

CBP to facilitate the export were also altered to reflect the VIN of another vehicle of the same

make and model.

60.     The investigation also revealed that KUNLE AJISAFE had a business

relationship with HOPE KANTETE and defendant MICHAEL BANKOLE OMOWAIYE.

Specifically, on October 19, 2011, MICHAEL BANKOLE OMOWAIYE called HOPE

KANTETE on a telephone and informed her that "our big boy" – who was subsequently

identified as KUNLE AJISAFE – was "here to see you."  MICHAEL BANKOLE OMOWAIYE

told her that "big boy" was "trying to get stuff, so he came. He's loaded." HOPE KANTETE

responded "No problem, we'll take very good care of him." HOPE KANTETE told MICHAEL

BANKOLE OMOWAIYE to "put him in a nice hotel." When MICHAEL BANKOLE

OMOWAIYE told her that it would cost $500 per night, she responded, "Perfect" and repeated,

"Put him in a nice hotel."

61.     On October 21, 2011, HOPE KANTETE spoke with KUNLE AJISAFE

on the telephone and they agreed to meet in person at a specific location.  Law enforcement

surveilled that location and observed that HOPE KANTETE met in person with KUNLE

AJISAFE, MICHAEL BANKOLE OMOWAIYE and ROMAN VLADIMIR DILONE.

62.     Subsequently, intercepted communications revealed that HOPE KANTETE told KUNLE AJISAFE that he is her "number one client."  Intercepted communications also revealed that KUNLE AJISAFE agreed to buy several vehicles from HOPE KANTETE.  He emphasized, however, that he did not want BMW's because he "cannot sell BMWs in Nigeria."

63.     The investigation further revealed that MICHAEL BANKOLE OMOWAIYE brokered other deals between HOPE KANTETE and others.  Specifically, on October 5, 2011, MICHAEL BANKOLE OMOWAIYE and HOPE KANTETE spoke on a telephone.  MICHAEL BANKOLE OMOWAIYE explained that his friend was not happy at all with the 2010 Land Rover Range Rover because it had 20,000 miles and a scratch.  He added that his friend said that if "he is going to pay as much as 31K [meaning, $31,000] for the [Range Rover,] he would rather buy [a 2008 Range Rover] at an auction.  HOPE KANTETE responded that "the only reason she got him that RR was because her guy was in jail and just came out yesterday."  Based on my training and experience, and my knowledge that a 2010 Land Rover Range Rover, Supercharge, with 20,000 miles has a market value of at least $60,000, I believe that HOPE KANTETE and MICHAEL BANKOLE OMOWAIYE were discussing the sale of a stolen vehicle.

# ATTACHMENT A.1











